IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 17 CR 647-1 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| JERRY ADAMS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

For the reasons stated below, Defendant's motion to suppress [32] is respectfully denied. This case remains set for status hearing on February 15, 2019 at 9:00 a.m.

**I.  Background**

The Seventh Circuit has described "the resolution of a motion to suppress" as a "fact-intensive inquiry" in which the district court must make "credibility determinations" based on "its opportunity at the suppression hearing to hear the testimony and observe the demeanor of the witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005); see also *United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994) (explaining the deference given to the credibility determinations of the district judge who has "heard the conflicting testimony, observed the witnesses, and then reached a determination about whom to believe").  After considering the written interview report and other exhibits, Adams's affidavit, and the live testimony of the agents, and making any necessary credibility determinations, the Court sets forth the following recitation of the facts surrounding the encounter between Adams and the law enforcement officers that gave rise to the motion to suppress currently before the Court.

According to the criminal complaint [1], on the morning of September 30, 2017, Defendant Jerry Adams attacked and attempted to rob a GardaWorld armored truck guard who was making a

$240,000 cash delivery to a currency exchange on the west side of Chicago. After Adams struck the guard with a hammer, the guard opened fire and shot Adams four times—twice in his chest and once each in his right forearm and right thigh. A few minutes later police encountered Adams and arranged for his transport by ambulance to Mt. Sinai Hospital. Adams was given morphine, intubated, and taken into surgery to repair the gunshot wounds, including to his heart, within the hour. Following successful surgery, Adams was placed in intensive care in critical condition. Officers from the Chicago Police Department were stationed outside of Adams' room until the morning of October 1, when the FBI took over responsibility for Adams. Both by virtue of his precarious medical condition and his status as a suspect in a serious crime, Adams would not have been allowed to leave his room prior to the agents' visit.

The next day, October 1, 2017, FBI Agent Michael Lovernick and FBI Task Force Officer Kevin Eberle went to the hospital hoping to interview Adams. They first arrived around 12:30 p.m., which was approximately 24 hours after Adams' surgery. On cross-examination at the suppression hearing, Agent Lovernick stated that the officers came to the hospital after receiving word from an FBI supervisor that Adams was alert and responsive and had spoken to some of the medical staff. Once they arrived on the ICU floor, the officers confirmed with the nursing staff that Adams was able to communicate. According to the officers' testimony, they encountered Adams in a hospital bed and during their first contact spoke with him for about three to four minutes. Adams was in a dual-occupancy room with a curtain partition separating him from another ICU patient who was in the adjacent bed. Prior to commencing the interview, the agents had reviewed Adams' criminal history and were aware that he had approximately ten prior arrests, but likely only one prior felony conviction. According to the officers, upon arrival at Adams's room, they filled out and read Adams his *Miranda* rights using the standard FD-395 Advice of

Rights form. Adams indicated his willingness to speak to them, but added that he was not feeling well at that time. The officers decided to discontinue the interview and come back at a later time.

A little more than six hours later, around 6:45 p.m., the officers returned to Adams' room hoping to complete the interview. Other law enforcement officers remained seated outside the room, which was still occupied by both Adams and another patient on the other side of the curtain. At that time, according to the officers, Adams said that he remembered them from earlier in the day and was ready to speak. The officers then pulled out the FD-395 form from earlier in the day. According to the officers, Adams was not able to sign the form because of his injuries. Nevertheless, the officers say that Adams gave a verbal indication that he understood his rights. The officers then began their questioning about the attempted robbery. At the time, they did not know whether he was still in critical condition or what medications he may have been taking. Adams was hooked up to various monitors.

According to the officers, Adams was alert during the entire encounter, which lasted twenty-six minutes. Both officers testified credibly that they conducted the interview in a calm tone of voice and made no threats to Adams. They felt that Adams understood that they were law enforcement officers and that he comprehended the questions being asked. His responses were on-point and he was able to provide significant detail about his own background, as well as in regard to the events leading up to and immediately after the attempted robbery. Agent Lovernick testified that he attempted to record the interview with Adams, but the device did not work and thus did not capture the discussion. However, almost immediately after the interview Lovernick did write a report of the interview.

The interview report indicates that Adams recalled spending time on September 29, the day before the incident, with a man whose first and name Adams could not recall, but who went

by the nickname "Durchy." According to Adams, he knew Durchy from a stint that Adams spent at a prison in Lake County, Indiana following a conviction for child neglect. Adams did not know Durchy's address, but knew how to drive to his house from Lincoln Tech College, where Adams once attended school.

On the evening of September 29, Durchy and another man named Dooney arrived in a greenish-colored van to pick up Adams at an apartment that he shared with his wife. The three men drove around, with Dooney in the driver's seat, Durchy in the passenger seat, and Adams in the back of the van. They smoked marijuana for awhile in the van, until dropping Durchy off at his house. Adams and Dooney continued hanging out until the morning. According to Adams, at some point Dooney came up with a plan to rob an armored car, with Adams rushing the guard to either take the money satchel or distract the guard so that Dooney could grab the money.

The interview report relayed the following description from Adams about the how the plan actually unfolded the following morning, September 30: "At some point on Saturday morning, DOONEY dropped ADAMS off near a park on a 'main street', just down from a currency exchange. DOONEY gave ADAMS an orange construction vest and a hammer. The orange reflective vest reminded ADAMS of a similar vest he wore when he worked at O'hare [sic] Airport. While ADAMS was waiting on the street near the part, he was on the phone with DOONEY. ADAMS was wearing the construction vest and holding the hammer. At the same time as the armored car pulled up to the side walk, DOONEY told ADAMS to run. ADAMS understood this to mean he would run at the armored truck guard."

According to Adams, he followed what he understood to be Dooney's instructions and ran toward the guard, who shot Adams. He then recalls tripping and dropping the hammer, and then picking it up. Adams made it around the corner to the greenish-colored van. Dooney was nowhere

4

to be found, but Adams managed to start the van and drive away. After a few blocks, however, Adams was not feeling well. He parked and exited the van and asked someone to call 911. As the medical records confirm[1], Adams had sustained multiple gun shot wounds, including a shot that grazed his heart.

In an affidavit [34] signed on April 6, 2018 and filed in support of the instant motion to suppress, Adams confirmed that he arrived at Mt. Sinai Hospital on September 30, 2017, after sustaining multiple gunshot wounds. He further stated that he was given morphine, intubated, and taken to surgery. After surgery, he was placed in the intensive care unit in critical condition. He claims to have no memory of (1) speaking with law enforcement in the early afternoon or early evening of October 1, (2) being offered a *Miranda* waiver or in fact waiving his *Miranda* rights, or (3) answering any questions from law enforcement or providing a statement about the events of September 30, 2017. He further added that on October 1, he was "lying in a bed, heavily sedated, in tremendous pain from his injuries, and was attached to medical equipment, tubes and IVs."

On October 2, 2017, an arrest warrant [3] was issued for Adams on the basis of the criminal complaint [1] lodged by the Government and attested to by Agent Lovernick. On October 24, 2018, Adams was charged in a one-count indictment with attempted robbery, in violation of 18 U.S.C. § 1951(b). On March 26, 2018, Defendant filed a motion to suppress his post-arrest statement [32]. The parties have briefed the motion and the Court convened an evidentiary hearing

---

[1] The parties provided a collection of medical records but did not present any testimony from a doctor or other medical expert to explain anything of particular significance in those records. Nor did the parties present extended argument based on the records. One item to which the Government called the Court's attention was a neurological evaluation called a Glasgow Trauma Score. Counsel for the Government observed that on both September 30 and October 1, Adams "scored highly" on that evaluation. Defense counsel then confirmed that Government counsel "is right about what he is saying" about that test. Apart from that point, the Court's review of the medical records showed nothing unexpected and nothing that raised a concern about the accuracy of the overall picture conveyed by Mr. Adams's affidavit and the officers' reports and testimony.

on September 10, 2018, at which both agents testified and were subjected to cross-examination. Adams chose to stand on his affidavit [34] and did not testify. The Court has reviewed the transcript of the hearing, the exhibits received in evidence, and the medical records submitted *in camera*.

II. **Discussion**

    A. **Legal Standard**

For a criminal defendant's post-arrest statement to be admitted into evidence against him during a criminal trial, the government must be able to demonstrate by a preponderance of the evidence that the defendant waived his *Miranda* rights before making the statement. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). A defendant may waive his *Miranda* rights "only if that waiver was made 'voluntarily, knowingly and intelligently.'" *United States v. Carson*, 582 F.3d 827, 833 (7th Cir. 2009) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). More specifically, the waiver inquiry "has two distinct dimensions." *Burbine*, 475 U.S. at 421. A waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Additionally, a waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

In determining whether a defendant waived his *Miranda* rights "voluntarily, knowingly and intelligently," courts evaluate the "totality of the circumstances" surrounding the waiver.[2] *Burbine*, 475 U.S. at 421. The Seventh Circuit has identified a number of factors relevant to this

---

[2] Although whether a defendant made a knowing and voluntary waiver of his *Miranda* rights is a separate inquiry from a claim challenging the voluntariness of a confession, *Etherly v. Davis*, 619 F.3d 654, 662 (7th Cir. 2010), "in evaluating whether a [defendant] voluntarily waived [her] *Miranda* rights, [courts] consider the same factors * * * consider[ed] * * * in assessing the overall voluntariness of a confession." *Ruvalcaba v. Chandler*, 416 F.3d 555, 562 (7th Cir. 2005).

inquiry, including "the nature and duration of the questioning used to secure the confession, whether the defendant was prevented from eating or sleeping, and whether the defendant was under the influence of drugs or alcohol." *Watson v. Detella*, 122 F.3d 450, 453 (7th Cir. 1997). Courts also consider "the defendant's age, intelligence, education, and experience with the criminal justice system." *Id.* According to the Seventh Circuit, "absent a showing of some type of official coercion * * * a defendant's personal characteristics alone are insufficient to render a confession involuntary." *Id.* That said, "[w]hen the interrogating officers reasonably should have known that a suspect is under the influence of drugs, or alcohol, 'a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession." *United States v. Haddon*, 927 F.2d 942, 946 (7th Cir. 1991).[3] Courts generally will hold that a defendant's waiver is knowing and intelligent if he "understands that he can refuse to talk to the people asking him questions or stop the questioning once it begins; that the people asking him questions are not his friends but are police or law enforcement personnel who are trying to show he is guilty of a crime; that he can ask for and get a lawyer who will help him; and that he does not have to pay for that lawyer." *Collins v. Gaetz*, 612 F.3d 574, 588 (7th Cir. 2010). "It is only when the evidence in the case shows that the defendant could not comprehend even the most basic concepts underlying the *Miranda* warnings that the courts have found an unintelligent waiver." *Id.*

B.  **Application of Legal Standard**

Adams presents a straightforward argument in support of his motion. He insists that he could not have "voluntarily, knowingly, and intelligently" waived his *Miranda* rights given his physical and mental condition at the time that law enforcement officials interviewed him at Mt. Sinai Hospital. In support of this argument, Adams points to the following circumstances: (1) he had

---

[3] Presumably, the reference to drugs in the case law includes both illegal narcotics and those prescribed by a doctor, such as those administered to Adams following his surgery.

7

been shot and seriously wounded the day before; (2) he had undergone extensive surgery and remained in the intensive care unit; (3) he was heavily medicated with narcotic drugs; (4) he "was evidently confused and unable to think clearly about either the events of the morning of September 30, 2018 after being shot four times or the circumstances of his interrogation"; and (5) he was lying on a hospital bed, encumbered by tubes, drugs, and needles, and in extreme pain at the time of the interview.

Points (1), (2), and (5) are well-supported in the record and essentially uncontested by the Government. Point (3) has some support in the record, although the specific medications and their effects on Adams are not spelled out in any detail. But point (4) is actually contradicted by the record. In his affidavit, Adams claims that he has no memory of speaking with law enforcement officers at any time on October 1, 2017. But he says nothing at all to even suggest, much less demonstrate, that the officers' account of what he said during their twenty-six-minute interview was inaccurate or "confused" in any way. Adams certainly would know if any of the statements attributed to him about his own background—his education, his employment history, prior conviction and prison time, and even his acquaintances—were incorrect. His silence in that regard leads to the natural inference that those details were reported accurately and strongly suggest that he was both coherent and truthful with the investigators. The close correlation between the statements attributed to Adams about the interaction he had with the armored truck guard and the description of those same events given by Witness A, as reported in the criminal complaint, similarly undermines the suggestion that Adams's statement was not the product of "a rational intellect and a free will."[4]

---

[4] Had Adams's account of the events on September 30 been incomprehensible or inconsistent with the other known or easily verified facts, that would undermine the Government's contention that Defendant waived his *Miranda* rights "voluntarily, knowingly and intelligently." However, based on the testimony of the officers, Adams's statement was thorough, cogent, and accurate.

Multiple additional factors further support the Government's contention that Defendant's waiver of his *Miranda* rights was voluntary and intelligent. First, there is no evidence of (nor does Defendant) suggest that the agents or anyone else used physical violence or threatened violence to cause Defendant to waive his *Miranda* rights. To the contrary, the agents testified very credibly that they conducted the interview in a conversational manner. Moreover, the presence of another ICU patient in the room during both of the visits by law enforcement makes it unlikely that law enforcement would have resorted to any untoward attempts to intimidate Adams. Second, at the time of his arrest, Defendant was a native English-speaker in his early thirties who had studied for some time at Lincoln Tech College. See, *e.g.*, *Holland v. McGinnis*, 963 F.2d 1044, 1052 (7th Cir. 1992) (considering whether a defendant "was not disadvantaged by youthful ignorance or the naivete born of inexperience."). Third, Defendant had been arrested multiple times, had at least one prior felony conviction, and had served some time in prison—all suggesting familiarity with the criminal justice system prior to speaking with the agents. See, *e.g.*, *Lord v. Duckworth*, 29 F.3d 1216, 1223 (7th Cir. 1994) (identifying the fact that "[a]t the time of his interrogation, [defendant] was 35 years old and had experience with the criminal justice system by virtue of two prior felony convictions" as one of several factors that led to the conclusion that defendant's confession was voluntary); *United States v. Ross*, 510 F.3d 702, 710 (7th Cir. 2007) (citing defendant's "significant experience with the criminal justice system because of his prior convictions" as one of several factors leading the court to conclude that defendant's confession was voluntary). Fourth, the officers actually terminated their first attempt to interview Adams after he advised that he was not feeling well and then limited the interview to less than half an hour when they returned to the hospital six hours later. This was not a situation in which Adams could claim that "he was worn down before he confessed." *Id*.

To be sure, Adams's physical condition alone warrants close scrutiny of the both the circumstances under which he was interviewed and the contents of his responses. But under that scrutiny, the evidentiary integrity of Adams's statement holds up quite well. The agents testified credibly that Adams understood who they were, why they wanted to speak with him, and what they wanted to discuss. His detailed and evidently accurate answers confirm that he was alert and responsive throughout the interview. And there is no evidence that the agents employed intimidation, coercion, or deception. Finally, as the cases cited by the Government hold, the mere fact that Adams had been given pain medication does not render his waiver invalid: "a suspect's physical pain or drug use does not make a confession involuntary as a matter of law." *United States v. Walker*, 272 F.3d 407, 412-14 (7th Cir. 2001) (upholding the voluntariness of a confession where defendant was in heroin withdrawal but officers and emergency room physician testified that defendant was alert and coherent, albeit in pain); see also *United States v. Washington*, 99 Fed. App'x 750, 751 (7th Cir. 2004) (granting motion to dismiss appeal under *Anders v. California,* 386 U.S. 738 (1967), where there was no evidence that defendant's "will or understanding were impaired by the pain of his wound or the effect of painkillers"); *United States v. Khalil*, 214 F.3d 111, 121-22 (2d Cir. 2000) (statements made by defendant as he was being prepared for "life-saving surgery on his leg" were knowing and voluntary); *United States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002) (rejecting gunshot victim's claim of coercion where FBI took care in determining whether victim's medical condition would impair his ability to answer questions); *United States v. Hack*, 782 F.2d 862, 866 (10th Cir. 1986) (concluding that statements made two days after gunshot wound to defendant's mouth while defendant was in pain were voluntary).

In short, under the totality of the circumstances, the Court concludes that the Government has carried its burden of proving by a preponderance of the evidence that Defendant was given his

*Miranda* rights and that he knowingly and voluntarily waived those rights in choosing to speak with law enforcement on October 1, 2018. Accordingly, Defendant's motion to suppress [32] is respectfully denied. This case remains set for status hearing on February 15, 2019 at 9:00 a.m.

Date: February 14, 2019

_____
Robert M. Dow, Jr.
United States District Judge